UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIDIA HERNANDEZ ANCELMO,<br>Petitioner,<br>v.<br>POLLY KAISER, et al.,<br>Respondents. | No. 1:26-cv-05579-DJC-CSK<br><br><u>RELEASE ORDER</u><br>A#: 241-836-441 |

Petitioner Lidia Hernandez Ancelmo is a civil immigration detainee held at the California City Immigration Processing Center. Petitioner is in remission from cancer and suffers from a range of medical issues that have deteriorated rapidly due to deprivations of care while in custody. Petitioner was previously removed from the United States in violation of this Court's order and federal law and left by the Mexico-Guatemala border without medication, money, or identification. Since her return, she has been re-detained at the same facility under the same conditions that existed before her unlawful removal. She argues that her rights under the Due Process Clause of the Fifth Amendment to freedom from conditions that amount to punishment have been violated. (Pet. (ECF No. 1) at 1). For the reasons discussed below, this Court grants the Petition as to Count I and orders Petitioner's immediate release from custody.

## BACKGROUND

Petitioner is a non-citizen in the custody of Immigration and Customs Enforcement ("ICE"). Petitioner is the mother of two children, including a six-year-old with special needs. (Mot. to Compel, Ex. 2 (ECF No. 17-2) ¶ 14.) Petitioner entered the country in October 2022, was detained by immigration officials in Brownsville, Texas, and was released on an Order of Recognizance. (Opp'n, Ex. 1 (ECF No. 7-1) at 2.) Petitioner was convicted of misdemeanor forgery on January 23, 2024 and of misdemeanor unauthorized possession on October 22, 2025. (*Id.*) On March 6, 2026, Respondents took custody of Petitioner for the pendency of removal proceedings. (Opp'n (ECF No. 7) at 1; Opp'n, Ex.1.) Petitioner first filed a Petition of Habeas Corpus with this Court on May 20, 2026. (Opp'n, Ex. C (ECF No. 7-3) at 1.) Respondents asserted that Petitioner was subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(E) based on her criminal history, and Petitioner did not file a response contesting that assertion. (*Id.*) The Court accordingly denied the petition. (*Id.* at 2.)

Petitioner filed a new habeas corpus action on July 18, 2026, alleging that the conditions of her confinement violated her Due Process rights. (*See generally* Pet. (ECF No. 1).) On September 14, 2026, Petitioner filed a Notice of Urgent Circumstances and Request for Expedited Ruling on her Petition for Writ of Habeas Corpus based on her grave health issues. (Req. Expedited Ruling (ECF No. 31).) The facts of this case have been partially set out in the Court's order on August 20, 2026, ordering Respondents to return Petitioner after she was unlawfully removed. *Hernandez Ancelmo v. Kaiser*, No. 1:26-cv-05579-DJC-CSK, 2026 WL 2445562, at *4 (E.D. Cal. Aug. 20, 2026). The Court incorporates those by reference and recites here the facts relevant to Petitioner's claim that the conditions of confinement render her detention unlawful.

### I. Deprivations of Medical Care in Custody

The material facts related to Petitioner's medical issues and the care she has received while in custody are undisputed. Petitioner has pancreatic cancer which has

been in remission for five years. (Pet., Ex. A (ECF No. 1-2) at 38.) Her medical chart from custody lists twenty active medical issues. (*Id.* at 3.) The issues listed include myocardial infraction, colloquially known as a heart attack, hypertension, abnormal EKG, chest pain, dizzy spells, abnormal uterine bleeding, anemia, anxiety disorder, anxiety attacks, arm pain, and fungal infections. (*Id.*)

The record shows that these conditions have been caused or exacerbated by deprivations of medical care while in custody. Petitioner's husband, Victorino Garcia Ginez, testified that when Petitioner was arrested, she and her husband informed the arresting agents of her cancer diagnosis and her urgent need for "daily medication." (Pet., Ex. B (ECF No. 1-3) at 1.) He further represents that agents prevented Petitioner from bringing along her medication. (*Id.*) After Petitioner was moved through several facilities "without her life-sustaining medications," she arrived at the California City Processing Center, where she is currently detained. (*Id.*) Mr. Garcia Ginez asked the facility to allow him to provide Petitioner with her medication, but Respondents declined and refused to cooperate with Mr. Garcia Ginez in coordinating another pathway through which Petitioner would receive her medication. (*Id.*)

The record indicates that Petitioner disclosed to staff that she was a survivor of pancreatic cancer and repeatedly informed staff that she was undergoing extensive uterine bleeding.[1] On March 17, 2026, four days after arriving at the California City Processing Center, Petitioner reported to detention medical staff "that she had Pancreatic Cancer" which was in remission and suffered from abnormal uterine bleeding; staff noted that "a review of her items did not reveal any medications." (Pet, Ex. A at 38).[2] Without her medication, Petitioner reported that she was "soaking

---

[1] Relevant to the symptoms discussed below, the Court notes that abnormal uterine bleeding may be a symptom of cancer. *See Abnormal Uterine Bleeding,* MedlinePlus Med. Encyclopedia, U.S. Nat'l Libr. of Med., https://medlineplus.gov/ency/article/000903.htm (last reviewed Oct. 15, 2024) [https://perma.cc/N7RV-AJ2H].

[2] Of course, the reason she did not have medication with her items was because arresting officers prevented her from bringing her medication with her.

through her pads." (*Id.* at 41.) A few days later, Petitioner "report[ed] she hasn't received her KOP [keep on person] medications," including estradiol to manage the bleeding. (*Id.* at 35–36.) In early April, Petitioner was also seen for "multiple lesions" on her breast and lips and "cracked blistering fingertips" attributed to a fungal infection. (*Id.* at 19–21.) At that time, she again reported to staff that she had "prolonged and heavy vaginal bleeding" which at that point had been ongoing for 2 months. (*Id.* at 19.)

The record also contains evidence that Petitioner identified for staff not only her history with cancer and her persistent uterine bleeding, but also the treatment she had received before detention and which she needed to avoid further deterioration and the testing required to check for underlying causes. In April, Petitioner informed staff that she had experienced heavy bleeding in the past, and that her physician outside of detention had brought the bleeding under control through "OCB patches." (*Id.*) She further told staff that her physician had directed her to follow up with an OB/GYN consultation to evaluate the causes of the bleeding, and staff noted that her prescribed regimen and her plans to test for root causes "changed/failed because she is in custody." (*Id.*) The medical records before the Court run through May 4, 2026. Through that date, the record does not contain evidence that the bleeding was controlled or treated in any way, or that Petitioner was able to access testing to determine its cause.

Separately, the record shows that Petitioner was deprived of her blood pressure medication. In early April, Petitioner went to urgent care for acute hypertension. (*Id.* at 24.) In mid-April 2026, she told staff, "I need my medication for blood pressure, as my condition persists; I truly need it urgently." (*Id.* at 15.) On April 30, 2026, staff encountered Petitioner visibly in pain. (*Id.* at 9.) Petitioner reported to medical staff, "I can't breathe and feel pulsations in my chest." (*Id.*)

As mentioned, the record does not extend past May 2026, but on September 14, 2026, Petitioner, through counsel, submitted that "the conditions at the California

City Immigration Processing Center continue to be inadequate." (Req. Expedited Ruling at 3.) Respondents do not present any evidence to dispute Petitioner's assertion that she is still not receiving the care needed "to manage her cancer remission or her severe cardiac and gynecological issues." (*Id.* at 4.)

**II. Respondents' Compliance with this Court's Past Orders**

As this Court has described previously, Respondents twice violated the Court's direct orders. *Hernandez Ancelmo,* 2026 WL 2445562. Respondents first removed Petitioner in "direct violation of this Court's administrative stay order," then failed to "take any meaningful steps to remedy [the violation], even though the Court has also expressly ordered such actions be taken." *Id.* at *4.

On July 22, 2026, Petitioner filed a Motion for Temporary Restraining Order stating that the Department of Homeland Security (DHS) had informed her that they intended to remove her imminently, even though she did not have a final removal order. (ECF No. 5.) A few hours after Petitioner filed her Temporary Restraining Order, this Court issued an administrative stay of Petitioner's removal. (ECF No. 6.) The following morning, in direct contravention of the Court's order, and federal immigration law, Respondents removed Petitioner to Mexico. *Hernandez Ancelmo*, 2026 WL 2445562 at *1. In effectuating her removal, Respondents "abandoned" Petitioner at the "remote southern border between Mexico and Guatemala" alone, not only without her medication but also "without any form of identification, without any money, and without a mobile phone to even call [her husband] or her attorneys for help." (Mot. to Compel, Ex. A at ¶¶ 4–5.) For three days, Petitioner's family "had no idea" where she was. (*Id.* ¶ 6.) "Despite being incredibly sick and weak," Petitioner traveled to Puebla, Mexico. (*Id.* ¶ 7.) At that point, Petitioner was "finally able to borrow a phone to contact [her] family and [her] attorneys." (Mot. to Compel, Ex B (ECF No. 17-2) ¶ 6.)

Petitioner then contacted ICE to request medication and was informed by ICE that her medication had been thrown away. (*Id.* ¶ 7.) The ICE agent further informed

Petitioner that Respondents would not provide her with transportation and instructed Petitioner to travel without medication, identification, or money to the San Ysidro Port of Entry almost 2,0000 miles away. (*Id.* ¶ 10.) According to the declaration of Deportation Officer Rigoberto Gilbert submitted by Respondents, "ERO San Francisco spoke with petitioner over the phone and explained to her that she would be responsible for travel to the San Ysidro Port of Entry and that she would be coming back to custody and detained at CCPC pending the results of her petition." (Decl. of SDO Rigoberto Gilbert (ECF No. 19).) Petitioner testified that ICE agents advised her to abandon her application for relief from removal and speculated that she would be "locked up in detention for many more months" only to eventually receive a deportation order. (Mot. to Compel, Ex B ¶ 11–12.)

On July 25, 2026, this Court issued a minute order instructing Respondents "to facilitate Petitioner's return to the United States on or before July 31, 2026." (ECF No. 12.) "Despite the Court setting a July 31, 2026, deadline for Respondents to facilitate Petitioner's return, that deadline passed without the Government providing any update to the Court." *Hernandez Ancelmo*, 2026 WL 2445562 at *2. On August 3, 2026, Petitioner filed a Motion updating the Court that Respondents had not facilitated her return. (Mot. to Compel (ECF No. 17) at 3–4.)

The following day, the Court held a hearing. During the hearing, Respondents continued to refuse to facilitate Petitioner's return. "SAUSA Davis confirmed that ICE would not provide any transportation, funding, or other assistance to facilitate Petitioner's return beyond the United States border," and "referenced the possibility that barriers existed which would prevent the Department of Homeland Security from securing transportation or otherwise facilitating Petitioner's return." *Hernandez Ancelmo* 2026 WL 2445562 at *3. When the Court asked about these barriers, SAUSA Davis stated that the Government could not "Venmo" the Petitioner for the cost of a flight. *Id.* The Court ordered Respondents to pay $568.69 in compensatory sanctions, representing the amount counsel for Petitioner incurred in making travel

arrangements for her client to reach the United States border. *Id.* at 4. On August 9, 2026, Respondents notified the Court that Petitioner had re-entered the country and was detained in California City Processing Center. (ECF No. 28; ECF No. 29.) On September 14, 2026, Petitioner requested an expedited ruling on her Petition for Writ of Habeas Corpus (ECF No. 1) based on the gravity and urgency of her medical issues. (*See generally* Req. for Expedited Ruling). The Court now turns to the legal claim presented in her Petition.

## DISCUSSION

### I. Abuse of the Writ

Respondents argue that this Court should dismiss the present petition as an abuse of the writ because Petitioner presents a claim that could have been addressed in her first habeas petition. (Opp'n at 3.) Respondents note that "Petitioner's health condition and the conditions of confinement existed at the time of the previous habeas petition, but Petitioner chose not to raise the issue." (*Id.*) It is true that the unconstitutional conditions of confinement that Petitioner alleges were present at the time of her prior habeas petition on May 20, 2026. However, this does not necessitate the dismissal of her present petition. The doctrine of abuse of the writ "forbids the reconsideration of claims that were or could have been raised in a prior habeas petition" unless Petitioner "can show (1) cause for bringing a successive petition and that prejudice would result or (2) that a fundamental miscarriage of justice would result from failure to entertain that claim." *Alaimalo v. United States*, 645 F.3d 1042, 1049 (9th Cir. 2011) (quotation and citation omitted). Here, the second exception is met. Petitioner alleges that she is unlawfully detained and that the unconstitutional conditions of confinement she faces are causing serious and potentially life-threatening deterioration in her health. (*See generally*, Pet.) As such, failure to consider Petitioner's new claim could lead to Petitioner's continued unlawful detention and untreated medical decline and result in a fundamental miscarriage of justice.

## II. Jurisdiction

Petitioner brings this action to challenge the conditions of her confinement under the writ of habeas corpus. She asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2241 because "a district court may exercise habeas jurisdiction over an immigration detainee's claims where continued detention under unconstitutional conditions renders the confinement itself unlawful." (Pet. at 3.) She maintains that "no set of conditions at the California City Processing Center can be considered constitutional while Petitioner is denied oncology treatment," and that as such "this Court has the authority to grant the writ and order her release." (*Id.* at 3-4.)

Section 2241 extends the writ to any person "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The Supreme Court has long distinguished between claims that go to the core of habeas and those that do not. Habeas is the appropriate remedy when a prisoner challenges the fact or duration of confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973). But prisoners "making a constitutional challenge to the conditions of his prison life" has other remedies available. *Id.* at 498–99; *see also Muhammad v. Close*, 540 U.S. 749, 750 (2004) (clarifying that "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus," and that "requests for relief turning on circumstances of confinement may be presented in a § 1983 action"). The Ninth Circuit has likewise channeled prisoner's conditions of confinement claims through § 1983, *Bivens*, or another civil rights vehicle rather than through § 2241 petitions. *See Crawford v. Bell*, 599 F.2d 890, 891–92 (9th Cir. 1979) (the appropriate remedy for the conditions of confinement claim presented is "a judicially mandated change in conditions and/or an award of damages"); *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (holding that a "civil rights action "is the proper method of challenging conditions of confinement"); *Brown v. Blanckensee*, 857 F. App'x 289, 290 (9th Cir. 2021) (directing the petitioner's conditions of confinement claim to "a civil rights action under *Bivens* . . . rather than a § 2241 petition"); *Nettles v.*

*Grounds*, 830 F.3d 922, 935 (9th Cir. 2016) (holding that Petitioner alleging unconstitutional conditions of confinement may not rely on the court's habeas jurisdiction but "must instead bring his claim under § 1983") (quotations and citation omitted); *Pinson*, 69 F.4th 1059, 1074–75 (9th Cir. 2023) (holding that the conditions of confinement case presented fell outside the core of habeas and noting the availability of claims under *Bivens* and the Prison Litigation Reform Act).

Notwithstanding the general rule that <u>prisoners</u> may not challenge their conditions of confinement in habeas, both the Supreme Court and the Ninth Circuit has left open whether an <u>immigration detainee</u> may challenge conditions of confinement through habeas. *Ziglar v. Abbasi*, 582 U.S. 120, 144–45 (2017) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement") (quoting *Bell v. Wolfish*, 441 U.S. 520, 526, n.6 (1979)); *Roman v. Wolf* 977 F.3d 935, 941–42 (9th Cir. 2020) (declining to decide whether a writ habeas corpus is the proper vehicle to pursue noncitizen detainee's claim because plaintiffs also brought a class action seeking declaratory and injunctive relief); *Zepeda Rivas v. Jennings*, 845 F. App'x 530, 535 (9th Cir. 2021) (doing the same); *see also Kaur v. United States Dep't of Homeland Sec.*, No. 1:25-cv-01726-TLN-SCR, 2025 WL 3542139, at *1 (E.D. Cal. Dec. 10, 2025) (noting that the question of "under what circumstances conditions of confinement claims are properly brought through habeas remains open"). While district courts are divided, many have exercised their habeas jurisdiction to review conditions of confinement claims by immigration detainees. *Calderon v. Barr*, No. 22-cv-00891-KJM-GGH, 2020 WL 2394287, at *2 (E.D. Cal. May 12, 2020), *report and recommendation adopted,* No. 22-cv-00891-KJM-GGH, 2020 WL 2543805 (E.D. Cal. May 19, 2020) (collecting decisions by district court faced with conditions of confinement habeas petitions during COVID-19 and

concluding that the "vast majority" found "jurisdiction appropriate under 28 U.S.C. § 2241" and discussing counterarguments).[3]

Given that Petitioner lacks the ability to bring any other claims that would remedy the alleged violations of her constitutional rights caused by the conditions of confinement, the Court concludes that habeas jurisdiction is appropriate here. The civil rights remedies to which the Ninth Circuit directs prisoners' conditions of confinement claims are not available to Petitioner. The comprehensive congressional scheme established by the Prison Litigation Reform Act does not apply to Petitioner as a civil detainee. 18 U.S.C. § 3626(g)(3); 42 U.S.C. § 1997e(h); *Agyeman v. INS*, 296 F.3d 871, 886 (9th Cir. 2002). Section 1983 governs suits against state actors and therefore does not reach claims arising out of federal detention. And the Supreme Court has declined to extend *Bivens*, which allows for suits against federal actors, to noncitizens challenging unconstitutional detention conditions. *Ziglar*, 582 U.S. at 139–47. Therefore, the "rationales behind *Nettles* and the Supreme Court's *Preiser* line of cases—in particular, the need to impose the correct set of statutory procedural safeguards on state prisoner claims—do not apply in a case involving federal immigration detainees." *Zepeda Rivas v. Jennings*, 465 F. Supp. 3d 1028, 1035–36 (N.D. Cal. 2020) (quotations omitted).

The Court therefore concludes that jurisdictional limits premised on the availability of better-suited remedies have no purchase in the present case. That conclusion is consistent with the Supreme Court's own treatment of immigration

---

[3] In doing so, many district courts have noted that claims by immigration detainees that their continued custody violates their due process rights are "patently" challenges to validity of confinement and therefore the province of habeas corpus. *Bent v. Barr*, 445 F. Supp. 3d 408, 413 (N.D. Cal. 2020) (concluding that where petitioner "contests that his continued detention during the COVID-19 pandemic violates his substantive due process rights," he is challenging not "merely" the conditions of his confinement but its validity) (quotations and citations omitted); *Sorio v. Hermosillo*, No. 2:25-cv-02492-TL, 2026 WL 413530, at *8 (W.D. Wash. Feb. 13, 2026) (concluding that "whether civil detention is unconstitutionally punitive . . . is a question that clearly sounds in habeas because it goes directly to the legality of the detention itself").; *Habibi v. Barr*, No. 20-cv-00618-BAS-RBB, 2020 WL 1864642, at *2 n.2 (S.D. Cal. Apr. 14, 2020) (concluding that "Petitioner is not challenging a specific condition of his confinement but instead claims that his confinement itself violates his due process rights—a direct challenge to the validity of his detention").

conditions of confinement claims. In denying a *Bivens* cause of action for immigrants alleging punitive conditions, the Supreme Court pointed immigration detainees towards two remedies: habeas and injunctive relief.[4] *Ziglar,* 582 U.S. at 144–45*.* (citing *Bell*, 441 U.S. at 526 n.6, and *Preiser*, 411 U.S. at 499). While declining to "determine the scope of habeas relief," the Court noted that the habeas remedy would be especially suitable to redress petitioner's claims since "the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages." *Id.* at 145.

Moreover, even if the traditional rules regarding the limitation on habeas jurisdiction to attacks upon the legality or duration of confinement apply in the civil immigration context, Ninth Circuit caselaw suggests that there is still jurisdiction over claims that the unconstitutional conditions of confinement cannot be remedied such that the "detention itself is without legal authorization." *Pinson*, 69 F.4th at 1065-70 (quoting *Crawford,* 599 F.2d at 891. In its most recent extended treatment of the question, the Ninth Circuit considered a habeas action brought by federal prisoners serving criminal sentences alleging that conditions during the COVID-19 pandemic violated the Eighth Amendment. *Pinson,* 69 F.4th at 1062. The Ninth Circuit affirmed

---

[4] Federal courts have a general equitable power to remedy constitutional violations. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). That power includes the authority to order "a reduction in population, if necessary to remedy a constitutional violation," even where the reduction "may [] require[] the release of some detainees." *Roman*, 977 F.3d at 942 (9th Cir. 2020) (quoting *Swann*, 402 U.S. at 15). The Ninth Circuit has upheld a district court's authority under its equitable powers to remedy unconstitutional conditions of confinement, to create an individualized bail process that "grant[ed] indefinite release to over 130 detainees." *See Zepeda Rivas v. Jennings*, 845 F. App'x 530, 531–34 (9th Cir. 2021). As such, the Court does not imply that habeas is Petitioner's only plausible path to release. But Petitioner's potential access to an equitable cause of action does not trigger the concerns discussed above that a petitioner will use habeas to evade the appropriate legal scheme. The implied equitable cause of action is a flexible doctrinal remedy and is not attached to specific safeguards or limitations that habeas would evade. Moreover, the injunctive relief route is not better suited than habeas for claims like the present one. While a district court's power to grant injunctive relief does include the ability to order release, the "compelled release of detainees" is "surely a remedy of last resort" for courts exercising their general powers to enjoin constitutional violations. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 643 (9th Cir. 2021). Habeas, by contrast, is the constitutionally designated vehicle for detainees' claims that their detention is unauthorized, and release is its traditional remedy. *Preiser*, 411 U.S. at 484.

dismissal for lack of jurisdiction, explaining that the claim before it did not sound in habeas because "the unsafe conditions of confinement" would be remedied "if the officials detaining petitioner followed an established protocol." *Id.* at 1074.

Importantly, *Pinson* did not hold that a conditions of confinement claim can never sound in habeas. In affirming the dismissal for lack of jurisdiction, the panel clarified that "we need not—and do not—attempt to circumscribe the reach of habeas relief" or "suggest the proper resolution of other habeas claims for other federal prisoners." *Pinson*, 69 F.4th at 1075, n.15. Instead, the panel clarified that whether such a claim lies at the core of habeas does not turn on whether the petitioner asks for release as the remedy, but rather on whether "release is legally required irrespective of the relief requested." *Id.* at 1070–73. Where a petitioner's own allegations show that relief short of release—such as requiring officials to follow COVID-19 protocols—would cure the alleged violations, the claim falls outside the core of habeas corpus. *Id.* at 1074. District courts have drawn the same line in the immigration detention context. *Compare Boscan v. Becerra,* No. 1:26-cv-00651-KES-SAB, 2026 WL 310093, at *2 (E.D. Cal. Feb. 5, 2026 (holding that "Petitioner's allegations that continued custody poses a substantial risk of serious harm, without more, do not state a habeas claim when . . . remedial measures short of release would address any such circumstance"), *and Prado Orozco v. Raycraft,* No. 2:26-cv-11985, 2026 WL 2138181, at *4-5 (E.D. Mich. July 24, 2026) (declining habeas jurisdiction where there was a "set of conditions of confinement that would remedy Petitioner's medical risks" and noting that detainee did not request the service he claimed he was denied and that the record indicates that "all the healthcare that Petitioner needs is possible and available in custody"), *with Kaur*, 2025 WL 3542139, at *1 (E.D. Cal. Dec. 10, 2025) (stating that in light of Petitioner's claim that her pregnancy-related health problems cannot be addressed in detention, it is "conceivable" that her claim is addressable through habeas).

The present claim falls on the habeas side of the *Pinson* line. There is no set of conditions short of release that could remedy the violations claimed by Petitioner. Petitioner contends—and Respondents do not dispute—that she has not only been deprived of available medication while in custody, but also that "the facility simply does not have the proper medical treatments available to manage her escalating heart, blood pressure, and cancer-related health issues." (Pet. at 5.) Unlike in *Pinson*, nothing in this record identifies a protocol that, if followed, would cure the violation; the record instead shows that the facility has been unable to deliver the care Petitioner received before detention and which she needs to prevent life-threatening medical events despite Petitioner's repeated requests for medical care. The facility's own records confirm that Petitioner's pre-detention regimen treating her abnormal uterine bleeding, and the testing her physician had ordered to determine its causes, "have changed/failed because she is in custody[.]" (Pet., Ex. 1 at 19.)

Moreover, the claims in *Pinson* were assessed against the ordinary presumption that a custodian will comply with a court's order. That presumption does not hold in the present case. Respondents have twice violated direct orders by this Court. Respondents removed Petitioner the morning after the Court stayed her removal, disposed of her medication, and refused, in direct violation of this Court's second order, to facilitate her return. *See generally Hernandez Ancelmo*, 2026 WL 2445562. In light of these extreme facts, the Court cannot presume that Respondents would effectively respond to an order ensuring that Petitioner receives the complex oncological, cardiological, and gynecological services she requires, even if such care were possible in custody. Accordingly, the Court concludes that Petitioner's claim falls within the "core of habeas." *Preiser*, 411 U.S. at 489. Having concluded that it has jurisdiction under 28 U.S.C. § 2241, the Court turns to the merits.

**III. The Merits**

The Fifth Amendment requires the Government to provide conditions of reasonable health and safety to people in its custody. *Roman*, 977 F.3d at 943. In the

Ninth Circuit, to show that her due process right to adequate medical care has been violated, a petitioner must show that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries

*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (holding a failure to provide adequate medical care claim by a pretrial detainee is properly analyzed under the Fourteenth Amendment Due Process Clause and "extending" the Ninth Circuit's deliberate indifference standard "to medical care claims"); *see Roman*, 977 F.3d at 943 (applying *Gordon* to claims by immigrant detainees that the Government violated their Fifth Amendment right to "conditions of reasonable health and safety to people in its custody"). The record establishes that each element of the four prongs of the *Gordon* test is satisfied.

First, Respondents made intentional decisions with respect to the conditions of Petitioner's confinement. The record shows Respondents knew of Petitioner's cancer history from the time of her apprehension but still deprived her of medication and refused to allow her husband to facilitate delivery of her medication. (Pet., Ex B at 1.) Even though while in custody Petitioner informed staff of the treatment she had received in the past, Respondents repeatedly deprived Petitioner of medication, leading to continual uterine bleeding. (Pet. Ex. A at 35–44). Petitioner's cardiological issues were also left to deteriorate despite her urgent request for medication. (*Id.* at 9–15). Moreover, despite their cognizance of Petitioner's history of pancreatic cancer and extensive health issues, Respondents unlawfully removed Petitioner to Mexico and left her without medication, money, identification, or a cell phone. (Mot. to

Compel, Ex. A at ¶¶ 4–5). Respondents informed Petitioner that her medication had been thrown away and told her she would have to make her own way roughly 2,000 miles to the San Ysidro Port of Entry without money, medication, or identification. (*Id.* at ¶¶ 7, 10.) After her unlawful removal, Petitioner was re-detained under the same conditions of confinement. (Req. Expedited Ruling at 3.)

Second, those conditions placed Petitioner at substantial risk of serious harm. She is a pancreatic cancer survivor whose remission depends on ongoing medication. (Pet., Ex. A at 38.) Her chart lists twenty active problems ranging from fungal infection to heart attack. (*Id.* at 3.) Medical records show that Petitioner's uterine bleeding resumed when she was taken into custody and was ongoing as of the last entry in the medical record, with Petitioner "soaking through her pads." (*Id.* at 19, 41.) Petitioner's cardiological issues have worsened significantly, culminating in an episode wherein Petitioner was unable to breathe. (*Id.* at 9.)

Third, Respondents have failed to take reasonable available measures to abate that risk. To satisfy the third *Gordon* prong, "mere lack of due care" is not enough: a petitioner must show "something akin to reckless disregard." *Gordon*, 888 F.3d at 1125 (quotation omitted). Here, as discussed, the record shows repeated, specific notice of Petitioner's needs and repeated dangerous deprivations of medicine and other medical care before, during, and after her unlawful removal. "[A] reasonable official in the circumstances would have appreciated the high degree of risk involved" in depriving a detainee with a history of pancreatic cancer of medical care, and of unlawfully removing a sick detainee to a remote region without medication, money, or identification. *Gordon*, 888 F.3d at 1125.

Fourth, Respondents' failure to take reasonable measures has caused Petitioner concrete injury: as discussed, she suffered continued abnormal uterine bleeding and repeated health emergencies in custody due to deprivations of medications and other care. As such, Respondents have already directly harmed Petitioner. The fourth *Gordon* prong can also be met prospectively. "To satisfy the fourth element, a plaintiff

need only prove a 'sufficiently imminent danger[ ],' because a 'remedy for unsafe conditions need not await a tragic event.'" *Roman*, 977 F.3d at 943 (quoting *Helling v. McKinney*, 509 U.S. 25, 33-4 (1993)) (alterations in original). Petitioner's documented deterioration, together with the absence of any evidence that her conditions of confinement have improved, show that these conditions pose an imminent danger to her health and safety.

Petitioner has established that her Due Process right to adequate medical care and safe conditions in custody has been violated. Respondents made intentional decisions that directly exacerbated Petitioner's oncological, cardiological, and gynecological conditions and failed to abate that risk even though a reasonable officials would have appreciated the high risk of harm to Petitioner. In accordance with the above, the Court finds that Petitioner's conditions of confinement render her detention unlawful. She is therefore entitled to the remedy that the writ of habeas corpus traditionally affords: "release from illegal custody." *Preiser*, 411 U.S. at 484.

## CONCLUSION

IT IS HEREBY ORDERED that:

1. Petitioner's Petition for Writ of Habeas Corpus (ECF No. 1) is granted as to Count One.
2. Respondents are ordered to immediately release Lidia Hernandez Ancelmo from custody and return all of Petitioner's documents and possessions.
3. Respondents are ENJOINED AND RESTRAINED from re-arresting or re-detaining Petitioner absent compliance with constitutional protections, which include, at a minimum, pre-deprivation notice describing the change of circumstances necessitating her arrest and detention and a timely hearing. At any such hearing, the Government shall bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight, and the Government

shall also bear the burden of establishing by a preponderance of the evidence that it can meet Petitioner's medical needs in custody. Petitioner shall be allowed to have her counsel present.

4. The Clerk is directed to serve the California City Detention Facility with a copy of this Order.
5. The Clerk of the Court is directed to close this case and enter judgment for Petitioner. This Order resolves all pending motions.

IT IS SO ORDERED.

Dated: **October 27, 2026**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC10-Acelmo-1:26-cv-05579.merits